**JET FORWARDING, INC.**

v.

**The UNITED STATES.**

No. 196–67.

United States Court of Claims.

Feb. 19, 1971.

---

**3.** See also 31 C.F.R. § 202.25(e) (iii) (1959).

Alan F. Wohlstetter, Washington, D. C., attorney of record, for plaintiff. Denning & Wohlstetter and Stanley I. Goldman, Washington, D. C., of counsel.

George M. Beasley, III, with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on March 19, 1970. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by plain-

tiff. Defendant excepted to Finding 28 but otherwise urged the court to adopt the commissioner's opinion, findings and recommended conclusion of law. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. At oral argument the plaintiff abandoned its contention that the volume rate should govern and limited its claim to the application of the alternative 500-lb. rate.

 The main issue in this case turns on the particular course of dealings between plaintiff's general (and authorized) agent in Japan and the defendant's transportation representatives there. The agreements on which suit is brought are the bills of lading under which the shipments moved, not the plaintiff's rate tenders. *Cf.* United States v. Louisville & Nashville R.R., 221 F.2d 698, 701–702 (6th Cir. 1955). When those individual agreements were made in Japan, the parties contracted in the light, not only of the bare words of the earlier Military Traffic Management and Terminal Service (MTMTS) letters requesting volume tenders and the plaintiff's tenders in response, but also, and significantly, in the light of the actual practice and understandings at the two air bases in implementing those tenders. The individual contracts thus made have been properly interpreted by the trial commissioner—with the help of the principle that contemporaneous construction by the parties must be given great weight, and also of the rule that a party knowing the meaning his opposite number gives to an agreement about to be consummated is bound by that understanding unless he speaks up—as having a different meaning from the usual or normal volume rate agreement. In this respect, this case differs markedly from Container Transport Int'l. Inc. v. United States, Ct.Cl., 437 F.2d 1365 likewise decided this day, in which no such special understandings and course of dealings were shown, and the individual shipping agreements were therefore interpreted according to the normal reading of the

defendant's request for a volume rate and the carrier's volume tender.

Since the court agrees with the trial commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, together with the foregoing paragraph, as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and its petition as amended is dismissed. Defendant is entitled to recover on its counterclaim and judgment is entered for defendant thereon in the sum of $9,406.33.

## OPINION OF COMMISSIONER

HOGENSON, Commissioner:

As the carrier with the lowest volume rate tendered to defendant on each of the subject mass movements, plaintiff was utilized by defendant to accomplish a mass movement of household goods of members of the Air Force from Misawa Air Base, Japan, to Eglin Air Force Base, Florida, and also such a movement from Yokota Air Base, Japan, to the same Florida installation.

In accordance with defendant's established program with respect to movement of such household goods, plaintiff provided to defendant door-to-door container service, which involved the prepacking and loading of the household goods of an individual member of the Air Force into specially designed containers at the origin residence of the member, transportation of the loaded containers to the port of departure, arrangement for movement via ocean vessels, transportation of the loaded containers beyond the port of discharge to the destination residence of the member, and placing the household goods in the new residence.

The mass movements from Misawa and Yokota occurred in the period from April 25 through July 15, 1965. During that period, defendant's transportation officers there prepared and issued 226 bills of lading covering the shipments.

Most of the 226 bills of lading were issued to cover the household goods of

only one Air Force member. However, 30 of them covered the household goods of two or more members, varying from 2 to 7. The total weight of household goods on each bill of lading varied from 366 to 11,927 pounds, except that for one bill of lading, the weight was 13,402 pounds. The weight of the goods of the individual members ranged from 366 to 6,690 pounds.

After plaintiff had accomplished the delivery of the shipments, plaintiff billed and defendant paid on the basis of application of the pertinent volume rate ($28.90 per cwt. for Misawa, or $26.80 per cwt. for Yokota) to the actual weight set forth on each bill of lading. For example, one bill of lading covered an aggregate of 6,745 pounds of household goods of 4 Air Force members, and plaintiff billed at its Misawa volume rate of $28.90 per cwt., applied to 6,745 pounds, for charges on that bill of lading of $1,949.31.

In this manner, and aside from accessorial services, plaintiff originally billed and was paid $166,197.53 on the pertinent shipments, insofar as 225 bills of lading were concerned.

Subsequently, in the period from July 27 through November 30, 1965, plaintiff submitted supplemental billings to defendant on each of the 225 bills of lading, applying the pertinent volume rate ($28.90 per cwt. for Misawa, or $26.80 per cwt. for Yokota) to 12,000 pounds for each bill of lading, irrespective of the lesser weight involved on each of them. Of course, this change of method of computation had no effect on the bill of lading covering 13,402 pounds, as plaintiff had billed on the actual weight of that shipment, and plaintiff submitted no supplemental billing thereon. For an example of the supplemental billings, adverting to the above-mentioned bill of lading involving 6,745 pounds, plaintiff's supplemental billing was at the $28.90 per cwt. rate, applied to 12,000 pounds, for claimed charges on that bill of lading of $3,468, or an increase of $1,518.69 from the $1,949.31 previously billed and paid.

In this manner, aside from accessorial services, plaintiff computed the pertinent transportation charges in its supplemental billings on the 225 bills of lading in the sum of $733,428, an increase of $567,230.47 over the amount previously billed and paid.

Defendant has refused to pay these supplemental billings.

On the basis that the correct computation of charges is the manner used by plaintiff in its supplemental billings, as contended by plaintiff but disputed by defendant, the parties agree that the amount of plaintiff's recovery would be $567,230.47, the amount sought by plaintiff in its petition as amended at the pretrial conference herein. If otherwise recoverable, such sum is subject to reduction by setoff of part or all of the $9,406.33 sought by defendant in its counterclaim, to the extent such counterclaim is sustained.

Defendant's basic position, with an alternative contention later discussed, is that plaintiff's method of computation of charges in its original billings was the correct way, aside from charges for accessorial services.

The counterclaimed amount of $9,406.33 includes three items: (1) The sum of $128.42, which the parties agree defendant is entitled to recover on its counterclaim, by setoff or otherwise, irrespective of the disposition of other issues in the case; (2) the sum of $555.09, which concerns the issue of the proper charges for returning the property of Airman First Class Cleland from storage in Pensacola, Florida, to Misawa Air Base, Japan, and which sum the parties agree is the correct amount of recovery by defendant, if defendant's method of computation of such charges is sustained; and (3) the sum of $8,722.82, which plaintiff included in its original billings and was paid, as additional charges over and above its volume rate computations, for accessorial services performed on the pertinent shipments, and which sum the parties agree would be the correct amount of recovery by defendant on its counterclaim, provided de-

fendant's position, contested by plaintiff, is sustained that the accessorial services were not additional to, but included within, those to be provided pursuant to plaintiff's volume rate tenders for the pertinent volume rates.

With respect to the issue concerning accessorial charges, the parties agree that the sum of $8,722.82 is not recoverable by defendant, if defendant's alternative theory disputed by plaintiff is sustained that the applicable rate in this case is $36.90 per cwt., subject to a 500-pound minimum weight per shipment. However, the parties agree that such sum is recoverable by defendant if the pertinent volume rates are applicable, either as interpreted by plaintiff or by defendant, provided defendant's position is sustained on the inclusion of the accessorial services in the pertinent volume rates.

Defendant's alternative position on the issues raised by plaintiff's petition as amended is that if the volume rates are applicable under plaintiff's theory, then defendant is entitled to the lesser charges which would result from application of plaintiff's rate of $36.90 per cwt., with a minimum weight of 500 pounds, applied to the actual weight of each bill of lading, except to 500 pounds on any bill of lading involving less than such minimum weight. This rate plaintiff had previously filed with defendant, and defendant contends that it remained available to defendant throughout the mass movements involved in this case. If such is the applicable rate, the parties agree that plaintiff would be due the sum of $57,324.06 as additional charges on the pertinent shipments, subject to application of any valid setoff.

It is my opinion that plaintiff is not entitled to recover, that its petition as amended should be dismissed, that defendant is entitled to recover the sum of $9,406.33 on all three items of its counterclaim, and that judgment should be entered for defendant on its counterclaim in that amount.

By separate letters, dated March 31 and April 7, 1965, the Military Traffic Management and Terminal Service (MTMTS) of the Department of Defense wrote to all household goods carriers authorized to provide service between Japan and the Continental United States (including plaintiff) concerning the two mass movements of household goods involved in this case. It was stated that the movement from Misawa would be about 317,900 pounds, and from Yokota about 502,200 pounds of household goods, with the former to occur from April 15 through June 15, 1965, and the latter from May 1 through July 1, 1965. Each carrier was requested as to each of such volume movements to

\* \* \* consider offering this Service a single factor transportation rate per net cwt. based on the 12,000 pound minimum weight, which would be a deviation from your present rate and which you consider compensatory and reasonable under the circumstances of this volume movement. \* \* \*

Within the times allowed, plaintiff and other carriers submitted their quotations in response to such solicitations. Plaintiff submitted the lowest volume rate on each movement, and was the carrier utilized by defendant thereon.

Plaintiff's submitted rate on the Misawa movement was $28.90 per cwt. with a "12,000 pound minimum," and on the Yokota movement, $26.80 per cwt. with a "12,000 pound minimum."

Within the 82-day period during which the actual mass movements from the Misawa and Yokota installations occurred, plaintiff removed therefrom (and in due time delivered to the Florida destination) a total weight of about 622,000 pounds of household goods. Involved were the individual shipments of household goods of 311 members of the Air Force. Thus, the weight of individual shipments averaged about 2,000 pounds per member, which was an average weight reasonably within the contemplation of MTMTS and plaintiff at the time of the MTMTS solicitation and plaintiff's submission of its volume rates.

Plaintiff's general agent in Japan was Thru-Container Services, Inc., and Thru-Container arranged to have plaintiff's local agent at Misawa, and also plaintiff's local agent at Yokota, pack the household goods of a transferring member of the Air Force into containers and remove the same from the pertinent air base for transportation to an ocean port.

The ocean ports utilized were Yokohama for the Yokota shipments and Hachinohe for the Misawa shipments, with the land transportation distances involved being respectively 35 and 15 miles. Awaiting ocean transportation, Thru-Container consolidated the shipments in a warehouse at each port, and the shipments were carried on three vessels to Pensacola, Florida.

Prior to the start of either of the mass movements, defendant's Traffic Management Officer at each base was advised by MTMTS that plaintiff had submitted the lowest volume rate, and each was supplied with a copy of plaintiff's volume rate tender and copies of the tenders of higher rates by other carriers on the pertinent mass movement.

To meet the 12,000-pound minimum weight requirement of the pertinent volume rate, the Traffic Management Office at each base planned to use and did use a different method of cross-referencing of bills of lading.

The method employed at Misawa is exemplified by two successive bills of lading issued May 12 and 13, 1965, covering respectively 5,269 and 7,782 pounds of household goods, or a total of 13,051 pounds. It was stated on the first of these two bills of lading that the 5,269 pounds covered a portion of a volume tender shipment, and on the second, that the 7,782 pounds were the remainder of the volume shipment initiated by the first bill of lading, stating the number of the prior bill.

The cross-referencing at Yokota was accomplished by grouping together ten successive shipments, aggregating in excess of 12,000 pounds, and by noting on the reverse side of each of the ten bills of lading, under the heading, Special Services Ordered, that each shipment was consolidated with the other nine shipments, with the numbers of the ten successive bills of lading noted.

The authority for cross-referencing of bills of lading in mass movements of household goods is contained in paragraph 16 of the regulations of the Defense Supply Agency, DSAR 4500.1, effective at all times relevant in this case, which provided in pertinent part as follows:

(a) Transportation officers making volume (mass) movements of household goods (as defined in par. XVII, DSAR 4500.1) will issue a separate Government bill of lading for each member's goods (each lot). Each bill of lading covering a portion of the volume (mass) movement will be appropriately cross-referenced in the "SPECIAL SERVICES ORDERED" space on the reverse of the bill of lading as follows:

1. First bill of lading issued to cover a portion of the volume movement tendered carrier (date) comprising approximately _____ pounds.

2. Second (and succeeding) bill of lading issued to cover a portion of the volume (mass) movement tendered carrier (date) comprising approximately _____ pounds, the first portion(s) of which moved on bill(s) of lading No.(s) (symbol, serial number(s), and date(s)).

3. Final bill of lading issued to cover the remainder of the volume (mass) movement tendered carrier (date) comprising _____ pounds, the first portion of which moved on bills of lading Nos. (symbol, serial numbers, and dates).

(b) When consolidation of two or more shipments will result in the application of a volume rate, i. e., 8,000#, 12,000#, etc., transportation officers will issue a separate Government bill of lading for each member's goods

(each lot) and identify each bill of lading in the "SPECIAL SERVICES ORDERED" space on the reverse of the bill of lading as follows: "This is a consolidated shipment comprised of bills of lading Nos. (symbol and serial numbers)."

The Traffic Management Office at Misawa relied upon the provisions of paragraph (a) above, whereas at Yokota, paragraph (b) was considered applicable.

Prior to the start of each of the subject mass movements, the manager of Thru-Container conferred with defendant's Traffic Management Officer at each of the bases concerning defendant's method of processing shipments of household goods to be used on each mass movement. Each Traffic Management Officer explained to Thru-Container his method of cross-referencing bills of lading to meet the 12,000-pound minimum weight requirement of plaintiff's volume rate.

In the discussion at each base, both Thru-Container and each Traffic Management Officer understood that plaintiff would be utilized as the sole carrier on each of the subject mass movements, and both knew, and it was discussed, that plaintiff's packing capability was limited at each base, with one local agent available at each location.

The established procedures, as explained to Thru-Container and applied on the pertinent mass movements, were that when a member of the Air Force came to the Traffic Management Office, with his orders concerning his transfer to Eglin Air Force Base, Florida, a date was set for the packing and pickup of that member's household goods, usually 7 days later, but sometimes sooner.

The Traffic Management Office then promptly notified Thru-Container, or the local agent, of the scheduled pickup of that member's household goods, either by telephone or by direct contact with a representative at the base. Thru-Container would then conduct a presurvey, or inspection of the pertinent household goods, to determine the requirements for the particular shipment. The bill of lading was issued prior to the pickup date, but usually after the presurvey had been conducted. Before the removal of the shipment from the base, an entry was made on the bill of lading, showing the weight of the shipment.

The pickup of the individual shipments occurred over the entire period of the mass movements, and each of the local agents was fully occupied on the pertinent mass movement.

The manager of Thru-Container frequently complained to defendant's Traffic Management Officer that plaintiff's packing capability at Misawa was so short that defendant should space out the shipments so that they could be more easily handled.

Except for the one bill of lading covering 13,402 pounds, concerning which plaintiff presents no claim, defendant did not offer to plaintiff at any one time on either of the subject mass movements, 12,000 or more pounds of household goods.

Under the heading of Tariff or Special Rate Authorities, each bill of lading was annotated by the appropriate Traffic Management Office, to show that the shipment was moving under the pertinent volume rate.

Plaintiff, by its authorized agent, Thru-Container, was fully aware of the methods employed by defendant in its efforts to take advantage of the pertinent volume rates, and was aware of the intended use of such methods prior to the start of subject mass movements.

At no time, throughout the subject mass movements, or prior thereto, did Thru-Container object to defendant's procedures, or to defendant's interpretation of the meaning of a tender of a minimum of 12,000 pounds of household goods under the provisions of the pertinent volume rate quotations.

█ It has been held that an essential element in the application of a volume rate is the requirement that a shipper tender the specified minimum weight

of the commodity to the carrier at one time to be shipped from one origin to one destination. Baggett Transportation Co. v. United States, 319 F.2d 864, 162 Ct.Cl. 570, 584–586 (1963); Hughes Transportation, Inc. v. United States, 169 Ct.Cl. 63, 68 (1965).

■■ However, this rule is not reasonably applicable to the facts and circumstances of this case. It is axiomatic that defendant is exempt from the statutory provisions prohibiting discriminatory rates as between different shippers, and whether or not defendant is using a carrier otherwise subject to such restrictions, its agreements concerning freight rates are subject to interpretation in the light of rules of contract construction seeking the true intent of the parties to the agreement. The meaning of the terms "12,000 pound minimum" is not to be resolved in this case on the basis of a technical rule of law, but rather by facts and circumstances which show what plaintiff and defendant truly meant in the use of such terms.

■ Both parties intended from the outset that plaintiff would be utilized as the sole carrier on the transportation of the large quantities of household goods involved on each of the subject mass movements. Plaintiff in subject case was not required to share with other qualified carriers the available shipments at the origin installations. Plaintiff knew that it would be offered, and in fact it was offered, all of the mass movement shipments which it was capable of handling, and all within an 82-day period of time. Plaintiff's agents did not object to defendant's interpretation of the terms "12,000 pound minimum," explained to them prior to the start of each of the mass movements. By their conduct throughout the mass movements, they showed their concurrence with defendant's interpretation. At Misawa, plaintiff's agent repeatedly urged defendant to spread out the shipments, as defendant consistently endeavored to do.

Prior to any dispute being raised concerning the failure of defendant to offer a minimum of 12,000 pounds of household goods at a time, the parties by their conduct and statements clearly showed that they were in agreement with respect to the meaning of the terms "12,000 pound minimum," and plaintiff is not entitled to the application of a technical rule of transportation law to the contrary.

It is held that the proper method of computing the transportation charges in this case, aside from those relating to accessorial services, was that used by plaintiff in its original billings, and that plaintiff is not entitled to recover on its petition as amended.

Thus computed, the transportation charges are less than they would be if defendant's alternative position were sustained, and it is unnecessary to decide the issues relating to that theory.

The remaining issues concern the validity of the $555.09 and $8,722.82 items of defendant's counterclaim.

■ While technically pleaded as items of counterclaim, each of these claimed overpayments of transportation charges falls within the rule of United States v. New York, N. H. & H. R. R., 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957), that the statutory law requiring defendant to pay transportation charges as billed by the carrier, subject to recoupment of overcharges on subsequent audit by the General Accounting Office, leaves the burden of proof on the carrier to establish the correctness of its transportation charges billed and paid, when disputed on subsequent audit. It was held that the carriers were to be paid promptly upon submission of their bills, that the carriers were to refund overcharges when they were administratively determined, that it was the intent of Congress in enacting the prompt payment law that the Government's protection against overcharges was not diminished, and that the carrier had the burden of proof on the issues concerning the correctness of the claimed overcharges, after the General Accounting Office had recouped the same by deduc-

tions from subsequent bills otherwise payable to the same carrier.

 Of course, there was no recoupment of any amount of the two disputed overcharges in this case, either in the post-audit procedures of the General Accounting Office, or otherwise. These claimed overcharges first arose during the pendency of this suit and in the course of the GAO audit of plaintiff's claims pursuant to the rules of this court. However, it is held that the correctness of plaintiff's charges on the pertinent billings, paid promptly in accordance with the prevailing statute, remain open to contest, and that plaintiff has the burden of proof on the two disputed items of claimed overcharges.

While plaintiff contests the validity of defendant's computation of the proper charges on the transportation of the household goods of Airman First Class Cleland from storage in Pensacola, Florida, to Misawa Air Base, Japan, plaintiff failed to offer any evidence concerning the existence of the rate upon which it based its billing on that shipment, or any evidence of the existence of any other rate which might have been applicable in lieu of that used by the General Accounting Office. The General Accounting Office determined that plaintiff had been overpaid in the sum of $555.09 on such shipment. Plaintiff failed to sustain its burden of proof as to the correctness of the charges in the amount which it billed and was paid, or as to the correctness of any amount in excess of that determined by the General Accounting Office. This item of the counterclaim is sustained.

As to the correctness of plaintiff's billings of additional charges for accessorial services on subject mass movements, plaintiff's volume rate tenders provided in pertinent part as follows:

16. Accessorial Services. The accessorial services shown below will be furnished by the carrier on request of the shipper at the rates or charges specified in this item, which will be in addition to the rates or charges shown in Items 11 and 12. Such requests must be shown on the bill of lading and initialed by the person requesting same.

The referenced Items 11 and 12 covered the quotation by plaintiff of the respective volume rates per cwt., with the 12,000-pound minimum weight.

Directly below the above-quoted provision concerning accessorial services, and within the appropriate space provided, plaintiff had on each of its tenders the typewritten words "Included in Transportation Rates."

In the absence of any testimony or evidence to the contrary, and without any convincing argument by plaintiff that a contrary meaning should be ascribed to the language of its tender, it is concluded that plaintiff's volume rates covered the accessorial services, that plaintiff incorrectly billed defendant and was paid additional charges for such services, and that defendant is entitled to recover the agreed sum of $8,722.82 on this item of its counterclaim.