Davis, Judge,
delivered the opinion of the court.*
Plaintiff is a Crown corporation of the Canadian Government established for the purpose, inter alia, to assist in the development of trade between Canada and other nations. Under the Canadian Commercial Corporation Act, Can. Rev. Stat. c. 35, § 10 (1952), plaintiff is authorized to sue or be sued in its own behalf.[1] Pursuant to Armed Services Procurement Regulation 6-504.2 (a), United States military contracts with Canadian suppliers are normally awarded to and admin *68 istered by plaintiff. When plaintiff receives a prime contract from a United States military department, it issues a “back-to-back” subcontract with the Canadian supplier that includes all of the provisions of the prime contract. Plaintiff then provides, without charge to the United States or to the Canadian supplier, administrative services for such contracts.[2]
In the latter part of 1957, Eadio Engineering Products, Ltd. (EEP), a Canadian corporation with extensive experience as a supplier of communications equipment for the United States Army, developed at its own expense a hermaphrodite electrical connector having redundant interconnected contacts to prevent polarity reversal. A hermaphrodite connector has both male and female contacts. Consequently, a single type of connector can be used for interconnecting electrical connectors, thereby eliminating the need for separate male and female connectors.
During December 1957 and the first few months of 1958, EEP developed at its own expense three types of hermaphrodite connectors (the EEP 1 connectors) embodying the principle of redundant interconnected contacts and a miniaturized electrical cable containing 26 pairs of conductors that could be used with these connectors. The cable connector was for mounting on the free end of a 26-pair cable, the panel connector for mounting on a wall, and the drop-line box connector for mounting on a piece of electrical equipment.
EEP took steps to protect any proprietary interest in the EEP 1 connector designs and miniaturized cable by filing a United States patent application on the concept of a hermaphrodite connector having redundant interconnected contacts and by notifying defendant, to whom EEP 1 drawings were given, that EEP considered its connector designs and cable specification proprietary, and by generally instructing EEP’s employees that any engineering designs were considered proprietary. The patent application was later abandoned, however, when the Patent Office cited prior art which anticipated the alleged novel features.
*69 From April to September 1958 defendant tested REP 1 cable connectors and REP 26-pair cable, along with cable connectors and 26-pair cable of other manufacturers. During the 2 months following these tests, REP modified its connector design for all three connector types. The resulting connectors (the REP 2 connectors) embodied several improvements over the earlier REP 1 designs.
On December 12, 1958, defendant issued to plaintiff a request for quotation (RFQ), Order No. 19143-PM-59-93-93 (referred to as order 19143), for, mler alia, REP 2 cable, panel, and drop-line box connectors, drawings therefor, and cable assemblies, each to consist of a 250-foot length of 26-pair cable with an REP 2 cable connector at each end. The cable, however, carried a Government designation and was to be furnished by defendant to REP. Furthermore, accompanying the RFQ was a copy of a cable assembly drawing illustrating REP 1 connectors, prepared by defendant on October 16,1958, almost 2 months prior to the issuance of the RFQ. Included in the RFQ were three “proprietary data” items for the three types of connectors. These items called for “information concerning the details of the contractor’s trade secrets and manufacturing processes which are not disclosed by the design itself and which, when coupled with the Production Drawings * * * will enable another contractor to manufacture [identical equipment].” The production drawings were to be made in accordance with military specification MIL-D-12464(SigC), which required the contractor to stamp each drawing with a “permissive use” legend giving defendant the right to use the drawings in subsequent procurements.
At a meeting on December 19,1958, between representatives of Canadian Commercial, defendant, and REP, plaintiff submitted to defendant a proposal to the RFQ having a bid on every item except the proprietary data items. REP contended that these items were uncalled for since the drawings themselves disclosed all of the proprietary data. Furthermore, REP did not wish to sell any proprietary data it had in the connectors. Defendant’s representatives took exception to this position by pointing out that plaintiff had bid on drawings *70 to be submitted pursuant to a military specification giving defendant the right to their use. The meeting was adjourned with no agreement on this point.
Immediately after this meeting plaintiff sent a telegram to defendant that modified the proposal by allegedly reserving all proprietary rights in designs and drawings for articles on which a quotation was made. On January 7,1959, defendant issued to plaintiff a notice of award on plaintiff’s proposal to the RFQ as modified by this telegram. Subsequently, on March 16, 1959, a formal contract was issued by defendant and signed by both plaintiff and defendant which, however, did not include the telegraphic modification to plaintiff’s proposal. The contract was back-dated to January 7,1959. It was in the amount of $1,901,950.92.
In early 1959, Specialty Engineering & Electronics Company (Specialty) was awarded two contracts by defendant for the manufacture of cable, panel, and drop-line box connectors. Pursuant to the requirements of these contracts, drawings for all three connectors were supplied to defendant by July 10, 1959. These connectors were similar to their REP 1 counterparts. In fact, plaintiff has contended throughout these proceedings that the Specialty drawings for these connectors were copied or derived from the REP 1 drawings. Nevertheless, plaintiff makes no claim for liability in the present suit to any improper disclosure by defendant of REP 1 drawings, since these drawings were not prepared and submitted pursuant to the 19148 contract or any other contract, express or implied in fact, with defendant, and since REP saw the Specialty drawings more than 6 years prior to bringing the present action, and would, therefore, be barred by the statute of limitations, 28 U.S.C. § 2501, from making any claim against defendant for improper disclosure of the REP 1 drawings.
Defendant became disenchanted with certain features of the REP 2 connectors in March 1959. Consequently, REP redesigned its cable and panel connectors during the next few months (the drop-line box connector having been deleted from the 19143 contract). The resulting connectors (the REP 3 connectors) were then produced by REP and supplied to *71 defendant pursuant to the 19143 contract. In September 1959, REP produced a new set of drawings for the cable and panel connectors that were submitted to defendant in October 1959 to satisfy the drawing requirements of the 19143 contract. These drawings contained the permissive use legend specified by military specification MIL-G-12464 (SigC), thereby giving defendant authority to use the drawings in subsequent procurements. The connectors illustrated on these drawings (the REP 4 connectors), however, differed in several respects from the earlier REP 1, REP 2, and REP 3 connectors.
In early 1960 a contract was awarded by defendant to Specialty to produce cable connectors having a modified design over the earlier Specialty cable connectors. This contract (the “penny” contract)[3] was amended on May 11,1960, to include the submission by Specialty of production drawings of the modified connectors. The connectors submitted by Specialty were not satisfactory, however, and, consequently, defendant made several “in-house” changes to the Specialty designs. Some of these design changes also applied to panel and drop-line box connectors resulting in modified connector designs for all three connector types (the Signal Corps connectors).
Plaintiff contends that the drawings prepared by defendant for the Signal Corps connectors, and used by defendant for procurements under the penny contract and subsequent contracts, were copied or derived from REP 2 drawings in breach of the 19143 contract. Plaintiff further claims that certain other drawings prepared by defendant for cable, panel, and drop-line box connectors (the “additional” Signal Corps drawings) also were copied or derived from REP 2 drawings and used in subsequent procurements in breach of the 19143 contract.
The case first reached the judges on defendant’s motion for summary judgment which was based on limitations, laches, and failure to state a claim in that the contract permitted the Government to use all the drawings in subsequent procurements. At that stage of the litigation it was assumed by *72 both parties that tbe REP 4 set of drawings did not bear tbe “permissive use” legend.[4] Plaintiff emphasized that fact (as it was then thought to be) in brief and oral argument, claiming that copying of either the REP 4 or the REP 2 sets was prohibited. The court denied the motion without prejudice and remanded for trial which was held before Judge Bennett (at that time the Chief 'Commissioner).
Without considering the Government’s legal defenses, Judge Bennett went directly to the facts, and after careful consideration of the record determined that plaintiff had failed to prove any copying by the defendant of those of the contractor’s drawings (the REP 2 set) which at the trial it claimed to embody proprietary data. He found as a fact that the Signal Corps drawings, to the extent they followed earlier work, were based on the Specialty and REP 4 drawings, rather than the REP 2 group.
If the case were before us solely on Judge Bennett’s opinion and findings, we would not hesitate to adopt them as fully supported by the evidence and law. But after submission of the Chief Commissioner’s recommended decision the plaintiff filed a motion to reopen the trial to permit admission and evaluation of certain evidence alleged to be newly discovered. According to plaintiff, this evidence shows that the Specialty drawings were themselves based on proprietary drawings of the plaintiff. This proffer raises a substantial question and, to avoid if possible an unnecessary remand for further trial, we have thought it appropriate to consider first the legal defenses pretermitted by the trial judge to see whether there is a meritorious ground for ending the litigation outright at this point. Without considering or reaching the other legal defenses, we have concluded that plaintiff’s contract did not preserve to it any right to keep confidential the REP 2 (or other) drawings, and therefore that the petition should be dismissed on the basis that the Government committed no breach even if it copied those drawings.
Plaintiff’s claim rests on the telegram it sent on December 19, 1958, to the Government. This said in relevant part:
*73 PLEASE ADD FOLLOWING STATEMENT TO OUR PROPOSAL SUBMITTED 19 DECEMBER 1958 THROUGH CANADIAN COMMERCIAL CORP ON ORDER 19143 QUOTE NOTWITHSTANDING ANYTHING CONTAINED ELSEWHERE IN THIS PROPOSAL WE DO NOT INCLUDE IN OUR OFFER PROPRIETARY RIGHTS TO DESIGNS INVENTIONS OR PATENT APPLICATIONS PERTAINING TO THE ARTICLES ON WHICH WE HAVE QUOTED STOP FULL INFORMATION ON THESE ARTICLES IS CONTAINED IN THE PRODUCTION DRAWINGS WHICH ARE OFFERED STOP THESE DRAWINGS WOULD PERMIT MANUFACTURE BY A COMPANY OTHER THAN OURSELVES ONLY IF ACCOMPANIED BY A LICENSE COVERING PROPRIETARY RIGHTS STOP * * * THIS TELEGRAM CONFIRMS THE DISCUSSION IN YOUR OFFICE ON DECEMBER 19 1958 WITH YOURSELF, MR. ASPDEN, MR. BENNETT AND OTHERS UNQUOTE * * *
The immediate occasion for this message was the meeting of December 19th, noted earlier, between the plaintiff’s and the Government’s representatives at which was discussed the Army’s right to use drawings for reprocurement. It will be recalled that defendant’s RFQ expressly said that the contractor’s production drawings were to be made in accordance with a military specification which required a stamp on each drawing giving the Government the right to use the drawings in later procurements. At the meeting, plaintiff’s agent stated that the drawings to be supplied under the proposal gave a complete physical description of the connectors and the methods of manufacturing them, and therefore no proprietary data items had to be revealed by REP. He understood the request in the RFQ for proprietary data to cover those “trade secrets” not disclosed by the drawings, and declared that REP was not offering any such “proprietary rights” to its drawings or designs but instead reserved those rights. The Army’s representative disagreed, pointing to the “permissive use” provision of the military specification, and warned REP in no uncertain terms that if it were to enter into a contract having that military specification, and were to furnish drawings prepared in accordance with that specification, the Government would obtain the right to the unrestricted use of the drawings. As we have already observed, the meeting ended with this issue unresolved but REP said that it would send a telegram reserving its proprietary rights *74 to the designs. There followed the crucial telegram quoted supra.
One is first struck, in reading carefully the terms of this communication, by its failure to say outright that any of the drawings could not be used for later purchases. What HEP said was that it excluded from its offer “proprietary rights to designs inventions or patent applications pertaining to the articles on which we have quoted” — “designs”, “inventions”, and “patent applications” are mentioned, but not drawings. The latter are referred to only in the next two sentences which say: “Full information on these articles is contained in the production drawings which are offered. These drawings would permit manufacture by a company other than ourselves only if accompanied by a license covering proprietary rights.” [5] Literally, this phrasing does not prohibit use of the drawings by other producers; what it forbids is unlicensed use of “proprietary rights” — whatever they may be — but not of the drawings themselves or of their contents 'per se. The sentence says, or can easily be understood as saying, that these other manufacturers can utilize the drawings but, in IIEP’s view, in order to fabricate the item properly these outside companies must also have authorization to use certain other “proprietary rights” then claimed by REP. Another way of putting this interpretation is that, though the defendant and its other contractors could use the drawings freely, they would still not be able to make the connector without trenching upon other rights asserted at that time by REP — primarily patent rights (which REP was then asserting).
This was apparently how the Government contemporaneously understood REP’s position. After the December 19th meeting, one of the Signal Corp’s representatives wrote to another that “It should be determined in view of Mr. Fisher’s [of REP] statement if he fully understands that in supplying drawings of the connector” under the military specification “he is giving any proprietary commercial and/or patent rights of manufacture and unrestricted right *75 of solicitation to the US Government.” The reference is not to use of the drawings themselves but to other “proprietary commercial and/or patent rights of manufacture.”
The defendant’s patent counsel wrote a memorandum reflecting the same understanding of the meeting and telegram of December 19th {see finding 27). He pointed out that at the discussion REP stated that (1) it had filed seven patent applications in the United States Patent Office covering features of the connectors, (2) “proprietary data” does not include the right to use these patents, and (3) if the Government wanted to use the patents, royalties would have to be paid or a license agreement negotiated. The government patent counsel agreed with this position, but went on to remark that when the REP people referred in the telegram to “proprietary rights” “they are referring to ‘patents’ issued or applied for, but they are not referring to ‘proprietary data’ which they have stated they do not have or own.” He added that the drawings to be supplied by REP “will be complete will not include any proprietary data, and no proprietary data will be withheld”, but that, if the drawings reflected or incorporated patent rights ultimately granted, the defendant would be on notice that it might then have to pay royalties or obtain a license.
Whether or not the plaintiff knew affirmatively of this government interpretation of the contractor’s position we cannot say on this record. But the only pertinent written communication from REP after the December 19th discussion and telegram (and prior to consummation of the contract) — a letter of December 26th — is wholly consistent with treating “proprietary rights” as “patent rights” (and “manufacturing know how” separate from the drawings). Cf. Shatterproof Glass Corp. v. Guardian Glass Co., 322 F. Supp. 854, 870 (E.D. Mich. 1970), aff'd on other grounds, 462 E. 2d 1115 (C.A. 6, 1972).
As so often the case, the parties never orally discussed this problem after December 19th, though they talked about other aspects of the procurement. The award which was issued on January 7, 1959, referred to the telegram as modifying the contractor’s original proposal, but the formal *76 contract (signed on March 16th, and back-dated to the award date) did not include the telegram or repeat its substance.
We pass over the controverted issues of whether the initial'award (which took cognizance of the telegram) or the formal contract (which did not) constitutes the enforceable agreement, and if the latter whether the parol evidence rule bars consideration of the telegram. Even if we assume arguendo that the telegram formed part of the final contract, the agreement should not be interpreted as giving plaintiff (including REP), or retaining for it, any proprietary interest in the drawings themselves.
Several strands, including those we have already singled out, weave together to bind us to that conclusion. The disputed telegram apart, the terms of the contract all plainly support the Government. The defendant’s REQ, expressly called for production drawings and said that these drawings to be supplied by the contractor “will be used by the Government for * * * reprocurement of equipment or procurement of maintenance items for the equipment.” Another clause gave the Government the right to “duplicate, use, and disclose in any manner for its Governmental purposes * * * all or any part of the technical information including reports, drawings, blueprints, and other data specified to be delivered * * The military specification, referred to in the REQ as governing the drawings, declared that “it is the intent of the Government to furnish to the same, or other contractors, those drawings as part of procurement data for reprocurement of that equipment”, and required each drawing sheet to bear the legend: “This document has been purchased by the Government and may be reproduced and used in connection with any government procurement or maintenance operation.” The defendant’s aim to employ the drawings fully for subsequent purchases could not have been clearer.[6]
*77 The Army’s negotiators insisted on this right to its fullest extent, and plaintiff (including REP) knew that they did. Yet the telegram the contractor composed and sent in order to resolve the problem was so worded, as we have shown, that the Government could readily and reasonably think that the plaintiff was willing to comply with this requirement as to the drawings themselves, reserving only such patent (or other rights independent of the drawings) as it might be found or shown to possess. (It turned out to 'have none.) This was the position the Signal Corps actually accepted at the time,[7] and plaintiff, as the creator of the ambiguity (if such it was) ,[8] is responsible for its own failure to clarify the meaning of the contract in definitive fashion before the Government was bound. WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 10, 323 F. 2d 874, 879 (1963).
After the contract was made, the contractor, without any protest or reluctance, voluntarily placed the “permissive use” legend on the production (PEP 4) drawings and handed them over to the Army for unrestricted use.[9] The argument now made is that all REP intended to preserve for itself were the earlier REP' 2 drawings — those supplied with the original proposal responding to the defendant’s RFQ (and which did not, of course, incorporate the “permissive use” language). We are now told that these preliminary drawings, which represented plaintiff’s view of what it was supposed to and would, provide under the RFQ, contained significant “proprietary” features later dropped or changed in the course of production and therefore not appearing on the *78 EEP 4 drawings. It is now said that the claim is for the copying of these omitted or modified elements.[10]
We cannot believe, however, that the parties intended these initial EEP 2 drawings to be in any different category from the production (EEP 4) drawings which plaintiff now concedes could be fully utilized. Both sets were given freely to the Government and both involved the very same connectors. As defendant says in its brief, it is most unlikely “that defendant contracted not to disclose or use the ‘this is what I will make’ drawings but obtained the right to the unrestricted use of the subsequent ‘this is what I made’ drawings.”[11] When the contract was made, prior to performance, plaintiff could not possibly know what (if any) features of the EEP 2 drawings would be changed or omitted during performance; in particular, no one could tell in advance if any modifications would be significant or whether they would affect alleged “proprietary” aspects. If there had in fact been no material modifications, the EEP 4 set would track the EEP 2 drawings but '(plaintiff admits) could be freely and completely useable despite the claim of “proprietary” features in the earlier set. There is absolutely nothing in the contract or negotiations to suggest that special protection was being given to those unpatented features of the EEP 2 group which later happened to be altered or left *79 out as a result of the requirements of actual performance. This is a 'highly improbable construction which plaintiff has not supported by anything tangible.
Finally, we are impressed by the fact that it took plaintiff four years before it first urged that the Government had violated EEP’s reserved “proprietary rights”. The contractor had actual knowledge by early February 1961 (see finding 52(d)) of defendant’s distribution to prospective contractors of all of the Signal Corps drawings which plaintiff claims were copied or derived from EEP 2 drawings. No protest at all was made until February 1965 when EEP filed a written document with the Army alleging improper use of EEP connector and cable assembly drawings (finding 55). During this period EEP bid unsuccessfully on at least some of the Army’s solicitations for these connector and cable items. We are warranted in seeing this four-year silence as a solid indication that, when the contract was made and during and after performance, the contractor either had the same view as the Government of the latter’s right to use all the drawings, or at the least that plaintiff fully accepted and acquiesced in that position. Cf. Jet Forwarding, Inc. v. United States, 194 Ct. Cl. 343, 345-46, 355, 437 F. 2d 987, 989, 994 (1971); Lykes-Youngstown Corp. v. United States, 190 Ct. Cl. 348, 363, 420 F. 2d 735, 743-44, cert denied, 400 U.S. 865 (1970); General Warehouse Two, Inc. v. United States, 181 Ct. Cl. 180, 187, 389 F. 2d 1016, 1020 (1967). Perhaps it was not until EEP finally recognized its patent applications as doomed that it began to consider seriously that it had proprietary rights in the drawings themselves, regardless of patentability.
We hold, for these reasons, that the Government had an unlimited right to use all the drawings for reprocurement.[12] The plaintiff is not entitled to recover and the petition is dismissed.[13]
*80 FINDINGS OF FACT
Tbe court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and arguments of counsel, makes findings of fact as follows:
1. This is a suit by Canadian Commercial Corporation ('hereinafter CCC), a corporation of Canada, brought under title 28 U.S.C. § 1491 for damages arising out of an alleged breach of contract by the United States.
2. CCC is a Crown corporation of the Canadian Government authorized under the Canadian Commercial Corporation Act, Can. Rev. Stat. c. 35, § 10 (1952), to sue or be sued in its own behalf. A United States citizen has the reciprocal right to file suit for breach of contract by the Canadian Government in the Exchequer Court of Canada. Pursuant to Armed Services Procurement Regulations (ASPR) 6-504.2 (a) contracts covering purchases from Canadian suppliers normally are awarded to and administered by CCC. Thus, CCC performs the important function of bringing together the United States Government and Canadian suppliers. Under contract with CCC direct communication between the cognizant United States military department and the Canadian supplier is authorized and encouraged in connection with all technical aspects of the contract, but approval of CCC must be obtained on any matters involving changes to the contract.
3. For contracts placed with CCC, ASPR 6-502(b) provides for administrative services such as cost and pricing analysis, production expediting, industrial security, and other related contract management functions to be furnished without charge by the Canadian Department of Defense Production to the United States Government. Additionally, in connection with such contracts, this section provides for audits by an office in the Canadian Department of Finance and for inspection personnel, services, and facilities by the Canadian Department of National Defense. Normally, however, these services are provided by CCC.
When CCC receives a prime contract from a United States military department, it issues a “back-to-back” subcontract with the Canadian supplier that includes all of the provisions *81 of the prime contract. CCC retains none of the contract price and makes no charge for its services.
4. Radio 'Engineering 'Products, Ltd. (hereinafter REP), is a Canadian corporation that has specialized for many years in military forward area tactical ground communications systems and apparatus and materials required to implement these systems, Charles B. Fisher is president of REP, and Sidney T. Fisher is vice president.
5. On June 26, 1957, CCC received a contract (hereinafter the Divcom contract), No. DA-36-039-SC-66422, pursuant to Order No. 891-PH-57-93 from the United States Army Signal Corps for the manufacture of items including seven shelter mounted communications assemblies. The contract was in the amount of $4,981,991.12, subsequently increased by 81 modifications to $14,619,727.75. CCC then immediately issued a back-to-back subcontract to REP to perform the work. Among other things, the Divcom contract required a quantity of 26-pair connectors for connecting 52 wires into a shelter wall. However, the contract specified that the type of connectors was to be determined at a later date, subject to future negotiations. The commercial connectors then available had some shortcomings and, consequently, development of a new connector was under way.
6. Early in 1957, REP assigned two engineers, V. Roth and A. Ursano, to develop a new connector. A series of connector designs were developed over a period of several months and submitted to the Signal Corps. The Signal Corps engineers, however, did not accept these proposals and, consequently, no connector design had been approved by November 1957. On November 7, 1957, Roth described to Sidney Fisher an idea for a hermaphrodite electrical connector having redundant, interconnected contacts to prevent polarity reversal. In response to a request by Fisher, Roth prepared a memorandum dated November 8,1957, describing his new connector. This memorandum was then shown to other REP personnel who agreed that this type of connector should be disclosed to the Signal Corps for use on the Divcom contract. Defendant’s assistant project engineer, Rocco Iamello, who at that time was assigned to the REP plant, was in *82 formed of the new connector idea by Fisher sometime during the period November 7-13, 1957, and was shown the Eoth memorandum on November 11,1957.
7. A cable connector is a device for electrically coupling conductors in one cable to corresponding conductors in another cable. The conductors at one end of each cable are mechanically and electrically secured to the connector, and the connectors then are physically mated together. A hermaphroditic connector is one having both male and female contacts such that only a single type of connector need be used for interconnecting conductors rather than separate male and female connectors. The hermaphroditic connector at issue in this case consists of three main parts: (a) an insulator block assembly or insert assembly, (b) a housing, and (c) a cover. The block assembly contains the male and female contacts that are electrically secured to the conductors and mate to corresponding contacts on another connector. The conductors are positioned adjacent to their respective contacts by means of a harness. The housing is a metal shell which houses the block assembly and the ends of the conductors connected thereto. The conductors are fed to an opening in one end of the housing through an external sleeve. A ring fits over the sleeve and the end of the housing through which the conductors are fed. When two connectors are mated together, the housings are physically coupled. The cover is a metal shell that is fitted to the housing when the connector is not mated to another connector. The cover therefore protects the block assembly and other components within the housing when the connector is not being used. In a waterproof connector, the mating of housing-to-housing between two connectors or the mating of housing-to-cover for an unconnected cable is such that a watertight seal is produced that excludes water from the interior of the connector,
In addition to the cable connector discussed in the preceding paragraph, two other types of connectors at issue in the instant suit are a panel connector and a drop-line box connector. The panel connector is mounted on a building wall, such as the Divcom shelter wall. The connector contacts then *83 may be wired to equipment proximately located with respect to the connector or may be cabled to more remote equipment. The drop-line box connector is mounted on a metal box, such as the piece of electronic equipment.
8. Although hermaphrodite connectors had been common for many years prior to 1957, REP believed that the concept of a hermaphrodite connector having redundant interconnected contacts to prevent polarity reversal was novel. Accordingly, a United States patent application on such a connector was filed by Roth on September 26, 1958. During prosecution of the application, however, prior art which anticipated the alleged novel features was cited by the Patent Office. Consequently, the application was thereafter abandoned, and a patent never issued.
9. At the pertinent times in question, the Signal Corps was organized as follows: the Office of the Chief Signal Officer (OCSigO) included a Research and Development (R&D) Division and a Production and Distribution (P&D) Division. Under the R&D Division was the United States Army Signal Engineering Laboratory (USASEL), Fort Monmouth, New Jersey (later called the United States Army Research and Development Laboratory (USARDL)), of which Salvatore Petrillo was the director of engineering. Under the P&D Division were the Signal Corps Procurement Agency (also referred to as the United States Army Signal Supply Agency (USA'SSA)), and the United States Army Signal Equipment Support Agency (US ASES A). Colonel Littel was the commanding officer of US ASSA. Colonel Stan-nix-Hay and later Colonel Price were the commanding officers of USASE'SA, and Halsey Hubbard was the chief engineer of USASESA.
Under USASSA were several Laboratory Procurement Support Offices (LPSO). Major John H. Vogel and later Major Charles E. Goodale and Captain John F. Harte were contracting officers at the Fort Monmouth, New Jersey LPSO. During the first half of 1958, Petrillo’s office of USARDL was the technical representative for the contracting officer on the Divcom contract.
10. At the request of the contracting officer for the Divcom *84 contract, Major Yogel, a meeting was held on December 19, 1957, at EEP’s offices in Montreal. At this meeting were representatives of CCC, KEP, and the Signal Corps. Connector requirements for the Divcom contract were discussed and Sidney Fisher displayed working models and drawings of the cable connector REP had constructed to embody the redundant contact features shown in the Roth memorandum of November 8, 1957. The Signal Corps representatives agreed that this was the connector that should be used on the Divcom contract. During this meeting Fisher notified the Signal Corps representatives that the connector development had been entirely funded by REP and carried out at REP’s own risk.
11. During December 1957 and the first few months of 1958, REP proceeded to develop a series of connectors and drawings therefor (referred to hereinafter as the REP 1 connectors) having the following REP designations:
K.EP 1 Connectors
Connector type: Designation
Cable_ F27880
Panel_ F28050
Drop-line box_ F36620
12. On February 5, 1958, Sidney Fisher was informed by Major Vogel that amendments were being prepared on the Divcom contract to add the REP 1 F27880 cable connector, whereupon Sidney Fisher wrote a letter the same day to the commanding general of USASEL which listed several items submitted or shown to the Signal Corps in the preceding year, including the REP 1 F27880 cable connector and the REP 1 F28050 panel connector. The letter stated, in part, that:
* * * These designs have been carried out at our own cost, and for this reason we assert a proprietary interest to them apart from patentable features.
Fisher then sent a letter dated February 24, 1958, to the commanding general, USASEL, adding an F24823 26-pair miniaturized cable to the aforementioned list of items.
13. In response to Fisher’s letter of February 5, 1958, Petrillo sent a letter dated February 19, 1958, to Fisher *85 acknowledging EEP’s proprietary rights to certain design features of equipment submitted to USASEL or shown to their personnel and stating that USASEL engineers were instructed to take proper precautions to safeguard these proprietary rights. However, the letter also advised that other Signal Corps activities to which the proprietary information had been disclosed should be separately informed of EEP’s proprietary rights.
With regard to notifying other divisions of the Signal Corps of EEP’s proprietary designs, EEP took the following steps: (a) a copy of Fisher’s letter of February 5,1958, purportedly was sent to Major Vogel, although he could not recall having seen this letter and it was not found in the Divcom contract correspondence files; and (b) during a visit to EEP on July 10 and 11,1958, by Colonel Littel, commanding officer of USASSA, and his deputy, Colonel Sanford (finding 9, supra), Fisher notified them that the connectors were proprietary items.
14. On February 10,1958, the Divcom contract was modified to include the EEP 1 F27880 cable connector. The Div-com contract again was modified on February 28, 1958, to include additionally the EEP 1 F28050 panel connector. While fabricating the equipment under the Divcom contract in 1958, EEP 1 connectors were installed and drawings were made. (See finding 11, supra.) Copies of the drawings were sent to USASEL in the first 7 months of 1958.
On July 14, 1958, the Divcom contract was further modified to include 300 cable assemblies, each containing a 250-foot length of EEP F24823 26-pair cable.
15. The United States Continental Army Command (CONAEC) was the organization that selected and tested the Divcom communications equipment. From April to September 1958, CONAEC tested the Divcom equipment, including the EEP 1 F27880 cable connector. CONAEC also conducted a parallel competitive evaluation of the EEP 1 F24823 26-pair cable having EEP 1 F27880 cable connectors, and an Okonite Company 26-pair cable having Elco-Specialty cable connectors (Elco Corporation and Specialty Engineering & Electronics Company).
*86 16. On September 30,1958, CONARC submitted a report on the competitive tests performed on REP cable having REP 1 connectors and Okonite cable having Elco-Specialty connectors. This report stated, inter alia, that the REP cable assembly (cable and connectors) was satisfactory with respect to the effects of sand, dust and dirt on unprotected connectors, but unsatisfactory with respect to submersion of the connectors in fresh water. The report concluded that the REP cable assembly should be modified, to correct the listed deficiencies, and adopted for Army use as an interim item in order to expedite production of the Divcom equipment, and that no further consideration should be given to the Okonite-Elco-Specialty cable assembly.
17. REP was informally advised of the CONARC test results about September 1, 1958. On September 23, 1958, Major Yogel wrote CCC advising that REP 1 F27880 cable connectors and F28050 panel connectors would be purchased by the Signal Corps in connection with the Divcom contract. However, the letter stated that it was the intention of the Signal Corps to negotiate a separate contract for these connectors and then to provide them as Government-furnished property (GFP) on the Divcom contract.
18. In response to the CONARC recommendations REP developed, during the period October to November 1958, a series of waterproof connectors and drawings therefor (referred to hereinafter as “preliminary” REP 2 connectors 'and “preliminary” REP 2 drawings), having the following REP designations:
REP 2 Connectors
Connector type: Designation
Cable_ F36640
Panel_ F36810
Drop-line box_ F37087
19. On October 24, 1958, T. Marko, a senior mechanical engineer for US ASES A, visited REP concerning their progress in waterproofing the connectors. On November 24, 1958, Halsey Hubbard, chief engineer for USASESA, visited REP for the purpose of discussing the forthcoming connector contract. In response to a request by Major Yogel, the preliminary REP 2 drawings were furnished to both Marko *87 and Hubbard during their visits to REP. These drawings, however, were not submitted pursuant to any contract existing at that time, such as the Divcom contract, but were submitted for Signal Corps review for the purpose of a request for quotation (RFQ,) to be issued by the 'Signal Corps for connector procurement.
20. On December 12,1958, LPSO, Fort Monmouth, issued an RFQ, Order No. 19143-PM-59-93-93' (hereinafter referred to as order 19143), on a sole source basis to CCC for 24 items, including the following pertinent ones:

Item No. Description

1 REP F36640 cable connector.
3 One lot production drawings for item 1 in accordance with MIL-D-12464 (SigC).
4 Drawings for gages for item 1 in accordance with MIL-G-13451A (SigC).
7 REP F36810 panel connector.
9 One lot production drawings for item 7 in accordance with MIL-D-12464 (SigC).
10 Drawings for gages for item 7 in accordance with MIL-G-13451A (SigC).
13 REP F37087 drop-line box connector.
15 One 'lot production drawings for item 13 in accordance with MIL-D-12464 (SigC).
16 Drawings for gages for item 13 in accordance with MIL-G — 13451A (SigC).
19 Telephone cable assembly CX-4566/G in accordance with USASESA drawing and data list SC-DL-34030-A dated November 12, 1958. Each cable assembly to consist of a 250-foot length of WM-130 ()/G telephone cable connector at each end. Cable WM-130 () /G to be Government-furnished property.
20 One lot production drawings for item 19 in accordance with MIL-D-12464 (SigC).
22 One lot proprietary data for item 1 (REP F36640 cable connector) “that provides information concerning the details of the contractor’s trade secrets and manufacturing processes which are not disclosed by the design itself, and which, when coupled with the Production Drawings being procured raider Item No. 3, will enable another contractor to manufacture equipments identical to that being procured under Item No. 1.”
*88 23 One lot proprietary data for item 7 (REP F36810 panel connector). (Same language used as quoted m item 22, except that reference here is to production drawings under item 9.)
24 One lot proprietary data for item 13 (REP F37087 drop-line box connector). (Same language used as quoted in item 22, except that reference 'here is to production drawings under item 15.)
Included in the RFQ were several Special Notes, including the following (quoted in pertinent part) :
Note 1: As part of the proposal, the Contractor shall furnish one (1) set of Reproducible Sepia Type Drawings and specifications for each of the following:
a. Connector, Cable, REP #F-36640 (Item No. 1).
b. Connector, Panel, REP #F-36810 (Item No. ?)•
c. Connector, Drop-Line Box, REP #F-3Y087 (Item No. 13).
Note 9: Production Drawings : * * *
b. New or revised drawings in accordance with Specification MIL-D-12464(Sig,C) shall be furnished to show each production change concurrently with the institution of such production changes. Only those changes authorized by the Contracting Officer will result in new or revised drawings.
$ ‡ ^ ‡ H:
d. It is understood that these production drawings will be utilized by the contractor in the manufacture of the equipment which they cover. It is further understood that these Production Drawings will be used by the Government for checking equipment produced on the contract and reprocurement of equipment or procurement of maintenance items for the equipment.
* * * * *
Note 14: Specification Provisions: The following specifications, amendments, annexes and drawings of the issued indicated [sic] are applicable to this procurement and shall govern in event of conflict with any others indicated elsewhere herein. * * *.
*89 Specification MIL-D-12464(SigC) was listed imder Note 14 with a note stating that this item could be from USASSA.
An unnumbered article, captioned Technical Information (ASPE 9-206) (ASPE Eev. No. 38,15 Oct. 58), was included as the last page of the EFQ. It provided as follows:
The United States Government may duplicate, use, and disclose in any manner for its Governmental purposes, including delivery to other governments for the furtherance of mutual defense of the United States Government and such other governments, all or any part of the technical information including reports, drawings, blueprints, and other data specified to be delivered by the Canadian Government, to the United States Government under this clause.
This clause differs principally from the ASPE section cited in the caption to this article in that the last word of the cited ASPE section is “contract” rather than “clause.”
Attached to the EFQ pursuant to item 19 was a drawing prepared by the Signal Corps of the Telephone Cable Assembly CX-4566/G, Drawing No. SC-D-34031, dated October 16,1958. Note 2 of the drawing stated as follows:
2. Shall be connector type No. F-36640 as supplied by Eadio Engr Products, Ltd, Montreal, Canada, or Equal.
21. It was the general practice of the Signal Corps to use drawings acquired from contractors in subsequent procurements from other contractors. With reference to order 19143 in particular, it was the desire of the Signal Corps to obtain all technical data rights so that free use could be made of the data. Consequently, items 22, 23, and 24 were put into the EFQ, as well as Special Note 9, and the unnumbered Technical Information article. Furthermore, Major Vogel was advised in a letter dated December 31,1958, from Colonel Bell of the P&D Division that the contemplated contract with EEP should specify that production drawings for the connectors must be obtained within 90 days after award, since they were necessary for obtaining competition in future connector procurements.
*90 22. Military specification MIL-D-1246-1- (SigC) in effect as of December 12, 1958, contained the following provisions (quoted in pertinent part):
1.1 * * * It is the desire of the Signal Corps that the drawings will be prepared and used by the original contractor for fabrication of the equipment on order and it is the intent of the Government to furnish to the same, or other contractors, those drawings as part of procurement data for reprocurement of that equipment. *****
8.3.2 Manufacturing data. — The drawings shall completely and fully cover all constructional details and processes * * * of manufacture and assembly of components, subassemblies and parts used by the contractor (or Ms vendors) during the course of production except that manufacturing information covering contractor’s catalog-standard or proprietary items or those of his vendors need not be furnished. * * *.
3.3.3 Design criteria. — Salient design features and performance characteristics and ratings of components, sub-assemblies, and parts shall be provided, unless such features and characteristics are covered completely by Government specifications cited directly or indirectly by the contract. The information shall be sufficiently comprehensive to enable procurement of equivalent items from other manufacturers.
*****
3.11 Marldng for Government use. — Each drawing sheet shall bear the following notation: “this document HAS BEEN PURCHASED BV THE GOVERNMENT AND MAT BE REPRODUCED AND USED IN CONNECTION WITH ANT GOVERNMENT PROCUREMENT OR MAINTENANCE OPERATION.”
23. The RFQ received by CCC was forwarded to REP which then began preparation of a proposal and a set of drawings (referred to hereinafter as REP 2 drawings) that were completed by December 18, 1958, and sent to CCC. The REP 2 drawings differed from the preliminary REP 2 drawings that were submitted to Hubbard and Marko (finding 19, supra), since the preliminary REP 2 connector had a design that was intermediate between the REP 1 and REP 2 connectors, although it was waterproof like the REP 2 connector.
*91 24. A meeting then was held between representatives of REP, CCC, and the Signal Corps on December 19, 1958, at Fort Monmouth. At this meeting, A. K. Aspden, Washington representative of CCC, gave to Major Vogel REP’s proposal which was typed on the RFQ. However, he only provided copies of REP 2 F3i6640 cable connector drawings, although Special Note 1 of the RFQ called for drawings of all three connector types to be submitted with the proposal. The proposal contained an offer for all of the items listed in the RFQ except proprietary data items 22, 23, and 24. Next to item 22, the following note was typed:
Not required. Production drawings Item 3 and'Special Note 1 cover all information known to REP on Item 1.
Identical notes were typed next to items 23 and 24 for the respective connectors and drawings therefor. A discussion ensued between Sidney Fisher and Hubbard over the deletion of items 22, 23, and 24 from the proposal. Fisher took the position that the drawings gave a complete physical description of the connectors and the methods of manufacturing them, and since the drawings were covered by other items in the proposal (items 3, 9, and 15), the proprietary data items were unnecessary. He understood items 22,23, and 24 to cover “trade secrets” not disclosed by the drawings. Furthermore, Fisher stated that REP was not offering any “proprietary rights” to its drawings or designs but instead was reserving these rights. Hubbard disagreed, pointing out that the RFQ called for the connector drawings in accordance with military specification MIL-D-12464(SigC), which would allow free use of them by the Government, and that the proposal was for drawings in accordance with this specification. Accordingly, he warned Fisher in no uncertain terms that if REP were to enter into a contract having that military specification and were to furnish drawings prepared in accordance with such specification, the Government would obtain the right to the unrestricted use of the drawings. The meeting ended with the proprietary rights question unresolved but Fisher told Major Vogel that he would send a telegram reserving REP’s proprietary rights to the designs.
25. On December 19, 1958, after the meeting, Fisher sent *92 a telegram to Major Vogel (that was not issued until December 22, 1958, because of an intervening weekend), which stated in pertinent part:
PLEASE ADD FOLLOWING STATEMENT TO OUR PROPOSAL SUBMITTED 19 DECEMBER 1958 THROUGH CANADIAN COMMERCIAL CORP ON ORDER 19143 QUOTE NOTWITHSTANDING ANYTHING CONTAINED ELSEWHERE IN THIS PROPOSAL WE DO NOT INCLUDE IN OUR OFFER PROPRIETARY RIGHTS TO DESIGNS INVENTIONS OR PATENT APPLICATIONS PERTAINING TO THE ARTICLES ON WHICH WE HAVE QUOTED STOP FULL INFORMATION ON THESE ARTICLES IS CONTAINED IN THE PRODUCTION DRAWINGS WHICH ARE OFFERED STOP THESE DRAWINGS WOULD PERMIT MANUFACTURE BY A COMPANY OTHER THAN OURSELVES ONLY IF ACCOMPANIED BY A LICENSE COVERING PROPRIETARY RIGHTS STOP * * * THIS TELEGRAM CONFIRMS THE DISCUSSION IN YOUR OFFICE ON DECEMBER 19 1958 WITH YOURSELF, MR. ASPDEN, MR. BENNETT AND OTHERS UNQUOTE * * *
A copy of this telegram was sent by Fisher to Aspden of CCC on December 19,1958, and another copy was sent by Aspden to J. E. Jones in Major Vogel’s LPSO on January 7, 1959. Fisher also sent a letter to Major Vogel dated December 23, 1958, which set forth the contents of this telegram. Furthermore, this letter stated that REP had not given drawings or sample connectors to anyone except Signal Corps personnel.
26. Hubbard wrote a memorandum to Major Vogel, dated December 22, 1958, regarding the meeting of December 19, which stated:
3. It should be noted that during the conference in your office on 19 December 1958 with Radio Engineering Products and government representatives, Mr Fisher of REP indicated that he considered the connector a proprietary item and he did not intend to sell their proprietary rights, but was in the process of licensing an American company subject to the approval of the Canadian Government. This conference information is in conflict with our interpretation of his bid which provides the US Government with production drawings under Specification MIL-D-12464(SigC). This specification, by our interpretation, gives the US Government the right to unrestricted use of the drawings. It should be determined in view of Mr Fisher’s statement if he fully understands *93 that in supplying drawings of the connector under Specification MIL-D-12464 (SigC) he is giving any proprietary commercial and/or patent rights of manufacture and unrestricted right of solicitation to the US Government.
27. Milton A. Bennett, an attorney-advisor with the United States Army Signal Patent Agency, Fort Monmouth, who recommended the patent rights and data clauses for every contract and solicitation issued from Fort Monmouth, attended the meeting of December 19,1958. On December 31, 1958, in response to a request by Major Vogel, he wrote a memorandum for Major Vogel interpreting HEP’S position with respect to proprietary information in view of the aforementioned meeting of December 19, 1958, and Fisher’s telegram of December 22, 1958. This memorandum stated as follows :
Sub.tect : U.S. Army Patent Agency Interpretation, Order No. 19143-PM-59-93-93
1. The solicitation called for three (3) items of proprietary data.
2. In the meeting with Eadio Engineering Products and Canadian Commercial Corp. held at LPSO on 19 December 1958, Mr. Fisher stated that Eadio Engineering Products has no proprietary data and, therefore, cannot quote a price for items of proprietary data.
3. Mr. Fisher stated, however, that Eadio Engineering Products has filed seven (7) patent applications in the U.S. Patent Office covering features of these Connectors and stated that his attorneys had advised that proprietary data does not include rights to use patents and if theU.S. Government wanted to use these patents or have another Contractor use them for the U.S. Government that royalties would have to be paid or a license agreement would have to be entered into with Eadio Engineering Products for the use of these patents. Undersigned agreed with this advice. (It should be pointed out that it is unlikely that royalties would be paid until patents had actually issued, but it would be possible for the U.S. Government to enter into a license to use these rights, called “proprietary rights” by Eadio Engineering Products, before a patent issued.)
4. With reference to the telegram sent by Eadio Engineering Products to Maj. Vogel on 22 December 1958 and *94 confirmed by letter dated 23 December 1958 wherever Radio Engineering Products refers to “proprietary-rights” they are referring to “patents” issued or appliea for, but they are not referring to “proprietary data” which they have stated they do not have or own.
5. The drawings to be furnished, which Radio Engineering Products states will be complete will not include any proprietary data, and no proprietary data will be withheld.
6. The drawings may possibly include new or novel ideas which form the basis for the seven (7) filed patent applications. The Government, or any Government Contractor, thus will be put on notice that patent rights may ultimately be involved which would require the paying of royalties or the entering into of a license agreement with Radio Engineering Products.
28. Charles Fisher, president of REP, sent a letter to Major Vogel dated December 26, 1958, in which he stated in pertinent part that:
4. The design of this connector was made by Radio Engineering Products. This company therefore considers it has proprietary rights in the design, and owns a number of inventions involved in this design. An application has been made for a U.S. patent and other applications are now being prepared.
The design and inventions were not made on instructions or at the expense of the U.S. or Canadian governments.
5. This company is prepared to take one or all of the following steps, as may be to the best interests of the U.S. Government, and this company:
a. Offer non-exclusive patent licenses to any U.S. or Canadian firm which applies for a license, * * *.
b. Arrange for one or more sources of supply for these connectors, within the U.S. and provide each source with patent rights and manufacturing know-how. * * *
29. A meeting was held at REP’s offices on January 2, 1959, with Major Vogel, Charles Fisher, Sidney Fisher, and other representatives of the Signal Corps, CCC, and the Canadian Department of Defense Production. Charles Fisher stated that REP had not set up anyone as a “second source” of connectors. Major Vogel then negotiated a reduction of *95 approximately $210,000 in REP’s proposal. There was no discussion of the proprietary data items in the RFQ (items 22, 23, and 24), nor was there any further attempt by either side to clarify what “proprietary rights,” if any, were being offered to the Signal Corps.
30. In early January 1959, the Signal Corps was also negotiating with Specialty Engineering & Electronics Company (hereinafter referred to as Specialty) of New York, for 5,000 panel connectors, Specialty Type No. 1366-P (thereafter the designation was changed by the Signal Corps to TJ-186A/G), modified to be waterproofed and mechanically and electrically equivalent in construction to and interchangeable with REP 1 panel connector F28050. This latter connector, as indicated in finding 14, supra, was being produced by REP under the February 28, 1958, amendment to the Divcom contract. Specialty offered to include in the contract a clause indemnifying the Government against any claims by REP for “infringement of proprietary or patent rights” which might arise because of this contract. They pointed out that the Government could accomplish this objective by including in the contract the following articles:
ASPR article No.: '¡'Ule
9-102.1_ Authorization Consent.
9-103.1 (a)_ Patent Indemnity (Predetermined) .
9-104_ Notice and Assistance.
9-203.1 and 9-203.2_ Data.
These articles, however, related only to indemnification to the Government for patent infringement and not to indemnification for infringement or improper use of proprietary data.
A contract, Order No. 19161-PN-59-93-93 (hereinafter referred to as the 19161 contract), was signed by Specialty on March 3, 1959, for the above connector item without indemnification provisions having been finally agreed upon, although the contract was written as having been entered into as of January 9, 1959. The indemnification provisions were inserted sometime after March 27, 1959, and consisted of all the ASPR clauses listed above, except that the Patent *96 Indemnity (Predetermined) clause (article 15 of the contract) was modified to apply only to United States patents on inventions owned or controlled by REP, made by REP employees, or which REP had the right to file on or grant this right to another.
31. In early 1959 Specialty also was awarded a contract, Order No. 7995-PP-59-C4-C4 (hereinafter referred to as the 7995 contract), for the production of Specialty Type 1866-C cable connectors (later designated U-185A/G by the Signal Corps) and Specialty Type 1366-OB drop-line box connectors (later designated U-187/G by the Signal Corps).
Specialty then submitted to the Signal Corps complete sets of drawings for the U-185A/G, U-186A/G and U-187/G connectors in accordance with the requirements of the 19161 and 7995 contracts, on the following dates:

U-mA/a U-Í86AIG U-187/G

Type connector....Cable_Panol_Drop-line box.
Date by which drawings submitted 6/26/59_ 6/21/59.. 7/10/59.
Contract No. 7995... 19161. 7995.
32. On January 7, 1959, Major Vogel’s LPSO issued to CCC a notice of award on order 19143. CCC promptly communicated this award to REP, and shortly thereafter CCC issued a corresponding award to REP containing the same language. The notice of award, signed by Major Vogel, stated as follows:
The United States of America, acting through the undersigned Contracting Officer, hereby accepts your offers dated 18 and 19 December 1958, as modified by your letter dated 2 January 1959 and your telegrams dated 22 December, 22 December, 31 December 1958, 5 January, 5 January, 6 January, 7 January, 7 January and 7 January 1959, submitted in response to Request for Quotation under PD Nos. 02-997036-03-1, 02-997036-04-1, 02-997036-05-1, 02-997036-06-1, for a firm price of $1,901,950.92.
This office will forward to you, as soon as practicable, standard Contract Form No. DD-351 as amended to date of your offer (as modified), including all applicable provisions required by Federal Law and Executive Order, together with the additional clauses contemplated by the terms of your offer. The contract will bear the date of *97 this Notice of Award and will be numbered as indicated above. All delivery dates will be computed from this date unless otherwise specifically provided.
You are directed to proceed with the performance of the contract in accordance with the terms of your offer and this acceptance.
Thus, the notice of award was an acceptance of plaintiff’s modified offer consisting of the proposal typed on the RFQ plus the contents of the December 22,1958, telegram set forth in finding 25. (The other letters and telegrams referred to in the notice of award either repeat the contents of this telegram, are irrelevant to the issues in this case, or were not introduced into evidence.) The resulting agreement shall hereinafter be referred to as the 19143 contract.
33. The formal contract on order 19143 was signed by CCC on March 16,1959. However, the contract stated that it was “entered into as of 7 January, 1959,” the same date as the notice of award. It did not include the proprietary data items called for in the RFQ (items 22, 23, and 24), but did include the other items called for by the RFQ. Additionally, it included the following pertinent clauses:
(a) “Special Note 5: Production Drawings” that was identical to Special Note 9 of the RFQ;
(b) “Special Note 11: Specification Provisions” that was identical to Special Note 14 of the RFQ; and
(c) “Article 11 Technical Information (ASPR 9-206) (ASPR Rev. No. 38,15 Oct. 58) ” that was identical to the unnumbered article captioned Technical Information in the RFQ. The contract also included a Special Note 10, which stated:
The work provided for under this contract is that covered iby Notice of Award, dated 7 January 1959, bearing Contract No. DA 36-039 SC-83881, Order No. 19143-PM-59-93-93, and this is the contractual instrument which was to be written pursuant to that Notice of Award.
However, there was no language in the formal contract referring to the letter and telegram modifications to the offer that had been assented to and accepted by the Signal Corps *98 in its notice of award. Furthermore, the formal contract was never altered to include these modifications.
34. On March 11, 1959, prior to signing the prime contract, CCC issued a back-to-back subcontract to EEP, as was its customary practice. (See finding 3, supra.) This subcontract included all of the line items and pertinent clauses contained in the EFQ, except for the proprietary data items. However, the last two lines of the Technical Information clause that had been included in both the EFQ (finding 20, supra) and the prime contract were changed from “specified to be delivered by the Canadian Government, to the United States Government under this clause1'’ to “specified to be delivered by this corporation to the United States Government under this contract.” (Emphasis added.) This change apparently was made by CCC to make the wording of this clause correspond to ASPE 9-206 (ASPE Eev. No. 38, 15 Oct. 1958), cited in the caption to the Technical Information clause, in both the EFQ and the prime contract and thereby correct a patent error. However, no such modification was made to the prime contract. In addition, Special Note 10 of the prime contract was not included in the back-to-back subcontract. The back-to-back subcontract was never altered to include the modifications contained in the notice of award.
35. On January 9, 1959, two days after the notice of award, EEP purportedly sent to the Laboratory Procurement Support Office, Fort Momnouth, a complete set of EEP 2 drawings for the cable, panel, and drop-line box connectors. These drawings were to satisfy the requirements of Note 1 of the EFQ, which called for drawings to be submitted with the proposal, and were not submitted pursuant to items 3, 9, and 15 of the 19143 contract. A letter from Sidney Fisher to Major Vogel was sent which stated:
* * * These drawings fully describe the designs on which our price quotation and delivery schedule are based. The tooling now in progress is for the parts shown on these drawings.
If changes are required by the Signal Corps from the designs shown by tnese drawings delivery or cost or both may be affected.
*99 However, these REP 2 drawings were not received by the Signal Corps with this letter, although the letter was received by Major Vogel.
36. On March 14, 1959, REP submitted to the Signal Corps preproduction samples of the REP 2 F36640 cable connector and the REP 2 F36810 panel connector, the latest issues of drawings therefor, and a technical action request (TAR) giving results of tests performed on these preproduction samples. These submissions were not made pursuant to any contract requirement, but to ensure USASESA acceptance of the connectors and orderly production and delivery. On March 19 and 20 the preproduction samples were tested by USASESA engineers. A meeting then was held at REP on March 20 between representatives of REP, the Signal Corps, and the Canadian Department of Defense Production. The Signal Corps representatives indicated some misgivings about the design of the connectors and recommended some modifications.
On March 23,1959, a meeting was held between personnel of the Fort Monmouth LPSO and USASESA to discuss the 19143 contract. Colonel Price of USASESA stated that USA-SESA was concerned about the connector insert because it was easily damaged. These inserts differed substantially from the REP 1 inserts that had been approved by CONARC and used in the REP 1 connectors supplied under the Divcom contract (findings 14 and 16, supra), and it was USASESA’s position that only the CONARC-approved connectors were to be supplied under the 19143 contract. Accordingly, the next day, March 24, 1959, Major Vogel requested Fisher to resubmit the REP 2 drawings that purportedly had been sent on January 9,1959. It was not until sometime after March 27, 1959, that these drawings were finally received.
37. On March 24,1959, a meeting was held between Major Vogel and Hubbard. Hubbard reported that Specialty was making good progress on the panel connectors it was furnishing under the 19161 contract. The possibility then was explored of requiring REP to stop production of their inserts and have them purchase inserts from Specialty. This possi *100 bility was further discussed between Signal Corps personnel over the next few days.
38. On March 31,1959, another meeting was held between representatives of EEP, Department of Defense Production, and the Signal Corps. The Signal Corps representatives reiterated their position that the connectors EEP was manufacturing differed substantially from what they had expected to receive under the 19143 contract and referred to a number of drawings. EEP then pointed out that these drawings were for the unwaterproofed EEP 1 connector and that under the 19143 contract the Signal Corps was purchasing the EEP 2 waterproofed connector. The Signal Corps initially denied any knowledge of redesign of the connectors, but finally admitted that they had received complete sets of drawings for the preliminary EEP 2 connectors and sample connectors during the period October to November 1958.
Hubbard stated that the Signal Corps did not wish to procure the present version of EEP 2 connectors. At the conclusion of the meeting, Major Vogel advised that the following action would be taken: (a) EEP was to proceed with the 19143 contract until directed otherwise; (b) EEP may be asked to redesign the connector; (c) when and if the contracting officer (Major Vogel) requested EEP’s concurrence with a stop work order, the contracting officer would be prepared to negotiate cost changes; (d) if requested, EEP would be required to submit new samples having inserts of the type approved by CONAEC; (e) the other parts of the connector were acceptable; and (f) the contracting officer would attempt to add progress payments to the contract if any of these changes were incorporated.
39. On April 1,1959, EEP submitted to USASESA drawings and handmade samples of a cable connector and a panel connector identical to the EEP 2 connector but having the type of insert desired by the Signal Corps. These drawings, however, were not required under items 3 and 9 of the 19143 contract, nor under any other provision of this contract. EEP gave new designations to these connectors (referred to hereinafter as the EEP 3 connectors) as follows:
*101 REP 3 Connectors
Connector type: Designation
Cable_ E40680.
Panel_ E40681.
Drop-line box_ (Dropped from contract — -see finding 42.)
Shortly thereafter USASESA engineers gave preliminary approval of these designs, with the reservation that final approval could not ¡be given until preproduction samples had been submitted by HEP and tested by USASESA.
40. (a) Within a few days of the March 31,1959, meeting (finding 38, supra) the Signal Corps placed a stop work order on the REP insert. Shortly thereafter REP was supplied a few inserts produced by Specialty under the 19161 contract, and REP was issued a technical action request that required modification of their REP 2 connectors being produced under the 19143 contract to allow mateability with Specialty connectors. On April 23, 1959, a meeting was held between representatives of REP, CCC, Department of Defense Production, and USASESA. During this meeting it was agreed that REP would submit 5,500 connectors for inspection provided that: (1) authorization was received from the contracting officer by April 24, 1959, instructing REP to proceed, following the stop order then in force, and (2) REP had received by April 25, 1959, a sample Specialty connector having all final dimensions with which REP connectors were to mate. Drawings were to be delivered with the first production quantities.
(b) Delays occurred in the above schedule, however, so that authority to proceed was not received from the contracting officer until April 31,1959, and a complete Specialty connector was not received until May 6,1959. Within a few days REP received a quantity of Specialty connectors but no drawings therefor, and consequently, REP gaged the critical dimensions to discover the average dimensions and tolerances to which REP should work to ensure proper mateability. On May 19, 1959, USASESA issued to REP a technical action request calling for changes in the mating dimensions. In response to these changes REP submitted new sets of REP 3 preproduction samples on May 23, 1959, and May 29, 1959. *102 Both sets of samples were rejected by US ASES A for minor technical reasons.
(c) Around June 10,1959, BEP received another quantity of Specialty connectors which they then gaged. These connectors, however, had different mating dimensions than the previously gaged lot of Specialty connectors. Since BEP was required by technical action request to furnish connectors that mated with Specialty connectors, BEP produced two additional sets of BEP 3 connector samples and sent them to US ASES A on June 19 and J une 30,1959.
(d) On or about July 8, 1959, BEP received still another lot of Specialty connectors that had further design changes and again modified their BEP 3 connectors to mate with this lot in accordance with the requirements of the above technical action request.
41. By April 21, 1959, BEP and CCC were aware of the Specialty 19161 contract for panel connectors, because sometime during the period April 9-21,1959, the Signal Corps had issued to BEP and Specialty, Solicitation No. PB SC-36-039-59-11166-C4 for panel and cable connectors identified as Specialty Type 1366-P (the U-185A/G connector) and 1366-C (the U-186A/G connector), respectively. This solicitation contained the following note:
Note: Bids offering a connector which is either (i) identical to Item 1 on PO 19161-PM-59-93-93 with Specialty or (ii) is interchangeable electrically and mechanically with BEP panel connector #F-28050, conforms with the requirements of TAB BEP #33, including ACTION IV on PO 19143-PH-59-93-93, and is waterproofed in both the mated and unmated conditions, will be evaluated on an equal basis.
TAB ACTION IY referred to in the above-quoted note contains the requirement that the BEP connectors be mateable with Specialty connectors.
42. On or about June 15,1959, the contracting officer notified BEP that items 13 through 18 of the 19143 contract covering the drop-line box connector and drawings therefor would be deleted from the contract. Pursuant to a notice of termination dated August 6,1959, the drop-line box connector and drawings therefor were officially deleted from the 19143 *103 contract. Consequently, no EEP 3 drawings were ever made for the drop-line box connector.
43. Following the modifications to the REP 3 connector design referred to in finding 40, REP began producing REP 3 cable connectors and cable assemblies under the 19143 contract and had completed approximately 2,000 cable connectors and 300 cable assemblies by September 30, 1959. Beginning April 1,1959, with the submission of REP 3 connectors and continuing through the following months of connector modifications, REP produced a series of revised REP 3 drawings.
Prior to October 2, 1959, REP then developed a new set of drawings for the cable connector and panel connector (referred to hereinafter as the REP 4 drawings) for which the designations of the cable connector and panel connector were changed as follows:
REP 4 Connectors
Connector type: Designation
Cable_ TT-185/G
Panel_ T7-186/G
The REP 4 drawings were prepared on Signal Corps format in compliance with the requirements of military specification MIL-D-12464(SigC). (See finding 22, supra.) Accordingly, these drawings contained the permissive use legend required by paragraph 3.11 of that specification. The REP 4 drawings did not have any type of restrictive use legend.
44. On October 2,1959, REP sent to USASESA REP 4 drawings for the U-185/G cable connector and the TJ-186/G panel connector. REP stated in a letter dated February 16, 1960, that these drawings were prepared “in accordance with MIL-D-12464 and fulfilling the requirements of Items 3 and 9 of the subject [19143] contract * * The Signal Corps received these drawings on October 5, 1959, but they were misfiled and not located until sometime during the period between February 24 to March 3,1960.
45. During the period when the REP 4 connector drawings were prepared, REP also prepared a set of drawings for gages for the REP U-185/G cable connector and U-186/G panel connector. REP initially submitted these drawings to the Signal Corps on August 25, 1959, stating in an accompanying TAR that this “submission fulfills requirement of *104 items 4 and 10 of this [19143] contract.” These drawings, which were thereafter used to manufacture the gages used in testing the EEP 4 connectors, contained the same permissive use legend appearing on the REP 4 connector drawings. (See fiuding 43, supra.) These drawings were rejected and returned to REP on September 11,1959, for corrections, and resubmitted by REP on September 28,1959. This submission was again rejected, and after several more resubmissions and rejections, the gage drawings were finally approved by the Signal Corps on March 9,1961.
46. The Signal Corps made a revised drawing, dated April 30, 1959, of the CX-4566/G cable assembly. This revised drawing no longer contained the note specifying that the connector should be REP F36640 or equal. (See finding 20, supra.) On July 27,1959, the Signal Corps sent a copy of this revised drawing to REP “for informational purposes only.” The Signal Corps made further revisions to the cable assembly drawing on August 1,1959, December 28,1960, and November 21,1962, none of which contained the above note.
None of the cable assembly drawings prepared by the Signal Corps had either a permissive use legend or a restrictive use legend. Plaintiff claims that these drawings were derived or copied from REP 2 cable assembly drawings and used for competitive procurement in breach of the 19143 contract.
47. On January 5, 1961, the Signal Corps received from REP a set of CX-4566/G cable assembly drawings prepared by REP on December 13,1960, and shipped on December 15, 1960. These drawings were prepared in accordance with military specification MIL-D-12464(SigC), pursuant to item 20 of the 19143 contract, and contained the permissive use legend required by paragraph 3.11 of that specification. (See finding 22, supra.) These drawings did not contain any type of restrictive use legend.
48. Paul Leeds, an engineer employed by the Signal Corps at the pertinent times in question, was asked in the latter part of 1959 by Colonel Price (finding 9, supra) to organize a group for the purpose of modifying and improving existing REP and Specialty connectors. It was the desire of the Signal Corps to obtain a set of drawings and specifications for modified U-185, U-186, and U-187 connectors which could *105 be used in subsequent procurements. In the early part of 1960 a contract was awarded to Specialty, Order No. 9386-PP-60-54-54, to produce 25 samples of modified U-185A/G connectors. The contract price was “one penny.” (Consequently, this contract is hereinafter referred to as the penny contract.)
49. (a) The penny contract was amended on May 11,1960, to include production drawings of the modified U-185A/G connector for an additional sum, and on July 7, 1960, the Signal Corps received a first set of drawings. These drawings were based on the earlier Specialty drawings for the U-185A/G connector prepared under the 7995 contract. (See finding 31, supra.)
(b) The sample modified U-185A/G connectors submitted to the Signal Corps were not satisfactory, and an urgent field requirement for connectors necessitated “in-house” design changes by the Signal Corps. These “in-house” changes were made by Leeds’ group between July 25 and September 19, 1960, using Specialty drawings as a basis for the modified design and the designation was changed to U-185B/G. The drawings prepared by the Signal Corps incorporating these design changes (hereinafter referred to as the Signal Corps drawings) were given drawing numbers in the series 159131 through 159180 that had been assigned to Specialty on the penny contract.
(c) Some of the Signal Corps drawings were also for use with panel connectors, resulting in a modified panel connector designated U-186B/G, and for use with drop-line box connectors, resulting in a modified drop-line box connector designated TJ-187A/G.
50. Plaintiff claims that certain drawings are Signal Corps drawings and were derived or copied from HEP 2 drawings and used for competitive procurements by the Signal Corps in breach of the 19143 contract. The drawings plaintiff claims are Signal Corps drawings and the corresponding PEP 2 drawings from which it is alleged these drawings were copied or derived are listed in the following table along with the corresponding PEP 1, PEP 3, and PEP 4 drawings and the corresponding Specialty drawings produced under the 19161 and 7995 contracts:

*106

*107 51. Drawings on Signal Corps format containing the permissive use legend of military specification MILr-D-12464 (SigC) (finding 22, supra) almost certainly have been prepared by contractors and not by the Signal Corps. Of the drawings claimed by plaintiff in finding 50 to be Signal Corps drawings, the 159171 cover drawing and 159131 housing drawing contain such a permissive use legend, and thus almost certainly were prepared by Specialty under the penny contract and not by the Signal Corps.
52. (a) On February 9,1961, the Signal Corps issued an invitation for bids (IFB) for the procurement of CX-4566/Gr cable assemblies and U-185B/G cable connectors. Accompanying the IFB, which was sent to 69 firms, including CCC, were copies of all the applicable drawings and specifications for these two items. The drawings for the U-185B/G connector included all of the Signal Corps drawings plaintiff claims were copied or derived from HEP 2 drawings. CCC submitted a bid, but the contract was awarded to Specialty on June 7,1961, Order No. 9417-PP-61-54-C-4 (hereinafter referred to as the 9417 contract). However, there is no evidence that either plaintiff or REP was notified of this contract.
(b) On March 6,1961, the Signal Corps issued an IFB, No. SC-36-039-61-505-54, for the procurement of U-187A/G drop-line box connectors. Accompanying the IFB were copies of the applicable drawings and specifications, including several Signal Corps drawings plaintiff claims were copied or derived from REP 2 drawings. A contract was awarded to Taffet Electronics, Inc., on May 31,1961. However, there is no evidence that either plaintiff or REP ever received a copy of this IFB.
(c) In 1962, a contract for CX-4566/G cable assemblies using U-185B/G cable connectors was made with Elco Corporation, Order No. 19089-PP-62-C1-C1 (hereinafter referred to as the 19089 contract). Again, there is no evidence that either plaintiff or REP had notice of this contract.
(d) Thus, by February 9, 1961 (or shortly thereafter), more than 6 years prior to filing the instant suit (which was filed April 28,1967), plaintiff had actual knowledge of defendant’s distribution to prospective contractors of all of *108 the Signal Corps drawings which it claims were copied or derived from KEP 2 drawings. However, a contract for manufacturing cable connectors pursuant to these drawings was not awarded until June 7,1961, within 6 years of filing the instant suit. PEP bid unsuccessfully on all advertised Army requirements ('known to it) for these connectors and cables in the years from 1952 through 1962 and subsequently.
53. The following table lists additional drawings prepared by the Signal Corps and admitted into evidence (referred to hereinafter as “additional” Signal Corps drawings). Plaintiff claims that these drawings were also copied or derived from REP 2 drawings and thereafter used for competitive procurements. In addition, plaintiff claims that two assembly drawings for the TJ-187/G connector prepared by the Signal Corps, Nos. 159173 and 204030, were both copied or derived from REP 2 drawing F34685. Neither the 159173 nor the F34685 drawing was offered into evidence, however, thereby precluding any finding with respect to these drawings.
Plaintiff further claims that Signal Corps drawing No. 349816 (revision C), dated May 11, 1961 (housing drawing for TJ-186B/G connector), was copied or derived by the Signal Corps from REP 2 drawing F34590. The original and revisions A and B of this drawing, dated, respectively, May 12, June 20, and August 12,1959, however, were prepared by Specialty under the 19161 contract, and revision C did not result in any drawing changes. Therefore, regardless of whether revision C was made by the Signal Corps or Specialty, the drawing itself was not copied or derived by the Signal Corps from REP 2 drawing F34590.

*109 54. The secrecy and notification thereof of the REP designs and drawings at the pertinent times in question is considered in this finding (a) with respect to REP employees and (b) with respect to outsiders, including REP suppliers and Signal Corps personnel.
(a) Secrecy With Res feet to REP Employees. REP employees were instructed generally that all technical work in the company was considered confidential. For the comiector program, all REP personnel who worked on the program were instructed that the connectors were considered proprietary. Regarding internal dissemination of connector data, only a few REP employees were familiar with the overall connector designs and had access to all of the drawings, while a larger number of REP employees (perhaps as many as 30) were familiar with various engineering aspects of the connectors and had access only to a few drawings.
REP had a code symbol for use on drawings it considered proprietary (a single diagonal line in the comer of the title block), but this symbol was used infrequently and inconsistently. Moreover, REP had another code symbol (two diagonal lines in the corner of the title block) for use on drawings which indicated that a drawing was not considered proprietary and could be released, and this symbol was used on a few of the REP connector drawings. It is found that REP did not have an effective program for marking particular drawings considered proprietary, but relied primarily on general instructions to employees to maintain confidentiality.
(b) Secrecy With Respect to Outsiders. REP contracted with other firms for the production of certain connector parts which REP considered proprietary. The only such firm particularly identified was Mack Molding Company of Canada which produced insulator block bodies. These firms were given only REP drawings of the particular item they were to supply but were not informed of the proprietary nature of the designs, nor were the drawings marked with any restrictive use legend.
Although some of the REP 1, REP 2, and REP 3 drawings supplied to the Signal Corps had the internal REP proprietary code symbol, the meaning of this symbol was not disclosed to any Signal Corps personnel. Furthermore, none of *110 these drawings contained any other restrictive use legends nor any permissive use legends. The REP 4 drawings, however, were prepared on Signal Corps format in compliance with the requirements of military specification MIL-D-12464 (SigC). Consequently, these drawings did not contain the REP restrictive use code symbol or any other restrictive use legend, but instead contained a permissive use legend. (See finding 22, supra.)
55. There is no evidence that either REP or CCC made any contemporaneous protest to defendant that it was misusing REP’s proprietary data by furnishing Signal Corps drawings or “additional” Signal Corps drawings to REP’s competitors for purposes of procurement. It was not until February 18, 1965, that REP filed a protest with the United States Army Electronics Command alleging improper use of REP connector and cable assembly drawings. Concurrently therewith plaintiff filed a number of protests with the General Accounting Office.
56. Plaintiff also alleges that military specification MIL-C-55036 (SigC) for the WM-130 () /G cable was copied or derived from the REP F24823 cable specification in breach of the 19143 contract. The following facts rebut the merits of this contention:
(a) The REP F24823 cable specification was not supplied to the Signal Corps in connection with the RFQ of December 12, 1958, or in any other connection with the 19143 contract or discussed at any of the meetings prior to the notice of award on the 19143 contract, or mentioned in any pre-award correspondence. On the contrary, the RFQ listed the WM-130 ()/G cable as property to be furnished by the Government to REP. (See finding 20, supra.) Furthermore, no cable data was required to be supplied by REP or plaintiff under the 19143 contract, and there is no evidence that any was supplied under this contract.
(b) As admitted by REP in its 1965 administrative claim military specification MIL-C-55036 (SigC) was prepared with REP’s assistance and issued on October 2,1958. Such a specification is, of course, a public disclosure of the contents contained therein. Thus, by October 2, 1958, REP was on notice that the alleged proprietary information contained in *111 BEP cable specification F24823 had been publicly disclosed, if military specification MIL-C-55036(SigC) was copied or derived therefrom. This publication date was more than 2 months before the BFQ was issued, more than 3 months before the notice of award on the 19143 contract, and more than 8 years before the petition was filed.
(c) The alleged contractual provision reserving plaintiff’s “proprietary rights to designs, inventions, or patent applications” further states that “ [f ]ull information on these articles is contained in the 'production drawings.” (Emphasis added.) (See finding 25, supra.) Neither the BEP F24823 cable specification nor military specification MIL-C-55036(SigC) for the WM-130 () /G cable contains or references any drawings. Thus, there was never any attempt by BEP or plaintiff to contractually reserve any proprietary rights in the cable specification.
Conclusion of Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

We borrow the statement of facts from the opinion of Judge Bennett (then Chief Commissioner) ; we reach the same result by deciding an Issue pre-termitted in that opinion.

 It is uncontested here that Canada and the United States provide reciprocal rights for suits against their governments by citizens of the other.

 In the remainder of this opinion, except as may otherwise be indicated, “plaintiff” Includes both the nominal plaintiff and the actual supplier, Radio Engineering Products, Ltd. (REP).

 So called because the contractor’s fee was one cent.

 It was later discovered that In fact the REP 4 drawings did carry the legend. See supra, and note 10 infra.

 Note, too, that REP used <the term “proprietary rights", not “proprietary data."

 Our finding 21 says: “It was the general practice of the Signal Corps to use drawings acquired from contractors in subsequent procurements from other contractors, with reference to order 19143 in particular, it was the desire of the Signal Corps to obtain all technical data rights so that free use could be made of the data. * *

 As shown by the materials ito which we have referred, especially the patent counsel’s memorandum. In addition, in negotiating with Specialty at about the same time, the Government took indemnity clauses from Specialty relating only to violation of REP’s patent rights, if any.

 As our whole discussion shows, we are by no means convinced that REP subjectively intended, in that period, to deny the defendant the right to free use of any of the drawings, except insofar as such use entailed infringement of patent rights.

 This was apparently true of both the “running sets” and the final production drawings.

 As we earlier indicated, supra note 4 and text, at the time the defendant’s pre-trial motion for summary judgment was presented to the court, both parties assumed that neither the REP 4 nor the REP 2 drawings had a “permissive use” inscription. In its arguments on that motion, plaintiff stressed that it had not put the legend on the REP 4 drawings and that the defendant’s officials had not asked it to do so. 'It was argued that these circumstances supported plaintiff’s contention that none of the drawings could be used in any way by defendant for reprocurement. The fact that the REP 4 set actually carried the legend was discovered, in the course of trial preparation, only after the court’s denial of the Government’s motion for summary judgment. It was then that plaintiff narrowed its position to the REP 2 drawings alone.

 When REP finally submitted a complete set of the REP 2 drawings — this submission was made late, two days after the award, although all of the drawings were supposed to have been transmitted with the proposal — the contractor said:
«» * * These drawings fully describe the designs on which our price quotation and delivery schedule are based. The tooling now in progress is for the parts shown on these drawings.
“If changes are required by the Signal Corps from the designs shown by these drawings delivery or cpst or both may be affected."

 Plaintiff floes not claim, anfl has not proven, that defendant used any “proprietary rights” apart from allegedly copying or using the REP 2 drawings themselves.

 Our holding moots plaintiff’s request to reopen proof. That motion falls with the dismissal of the petition for failure to state a claim.